IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mark Barron,                                                  Case No. 3:07CV3902

            Plaintiff,

v.

Vision Service Plan,                                ORDER

            Defendant.

     This case involves the alleged breach of a contract. Plaintiff Mark Barron, an Ohio-based optometrist, alleges that defendant Vision Service Plan [VSP], a California-based corporation that administers vision care insurance plans, breached a 1994 "grandfathering" letter [1994 Letter] allowing him to remain affiliated with VSP provided he did not violate its terms, and the Member Doctor-Agreement [Agreement] which incorporates the 1994 Letter. Barron also alleges a separate tort claim for violation of the implied duty of good faith and fair dealing. Jurisdiction is proper under 28 § U.S.C. 1332.

     Pending is Barron's motion for a preliminary injunction. [Doc. 2]. For the reasons discussed below, Barron's motion shall be granted.

**Background**

     VSP contracts with corporations and government employers to provide optical coverage to their employees. VSP does not provide any of these services itself, but refers covered persons to select independent contractors who have contracted with VSP to provide such services.

1

Generally, VSP will only cover members' visits to network optometrists. Members, however, may purchase additional coverage for visits to non-network optometrists. Benefits for visits to non-network optometrists are less than those for visits to network optometrists. Over ninety percent of VSP members visit network optometrists.

VSP requires that all network optometrists sign the Agreement and submit certification materials every three years. VSP alleges that it sends these materials to member optometrists approximately six months before the previous materials expire.

The Agreement attaches certain conditions and limitations to membership. If a member "fails to comply with the terms and conditions," VSP can terminate the Agreement immediately. [Doc. 2, Ex. 2]. Likewise, "any unapproved change of office address and/or material change in the ownership/operations/management of the practice . . . render[s] the agreement immediately void." [*Id.*]. The Agreement, furthermore, provides that either party can terminate it "by giving the other party ninety (90) days prior written notice." [*Id.*]

The Agreement also includes an integration clause:

[A]ll of the points in this Agreement, including VSP's Articles of Incorporation, By-laws, VSP Provider and Reference Manual, standards, protocols, rules, and Schedules of Compensation together with amendments and addenda thereto, shall constitute the entire Agreement between Member Doctor and VSP, and that none of these provisions therein can be waived verbally by any agent or officer of VSP.

[*Id.*].

Beginning in 1995, VSP began including an additional requirement that all optometrists have "majority ownership and complete control of all aspects of [their] practice[s], including dispensaries [*i.e.,* their office premises]." [*Id.*]. The Agreement explained that "VSP was founded on the belief that patients' interests are best served by the independent eye-care professional. This is the

2

cornerstone of VSP's operational philosophy. Member Doctor may not be affiliated, contractually or otherwise, with retail-commercial chain or franchise vision-care entities." [*Id*.].

Recognizing this would be problematic for optometrists who did not own dispensaries, VSP's Board of Directors, at their June, 1995 meeting, agreed to exempt Ohio and Michigan optometrists who were already VSP members. The optometrists, however, had to remain with their current employer, not change office locations, and meet all other articles, by-laws, rules or schedules. VSP mailed each of the exempted optometrists the 1994 Letter explaining the change to the Agreement and the exemption.

Barron has worked as a VSP affiliated optometrist since 1993. He is self-employed, but does not own his own dispensary. Barron alleges that he received the 1994 Letter which, "upon information and belief," he believes VSP sent to him. [Doc. 1]. He has continuously remained a VSP network optometrist.

Income from VSP and its members constitute Barron's single largest source of revenue. VSP reimbursements and client co-payments make up approximately twenty-five percent of Barron's annual income. In 2006, VSP reimbursements constituted twenty-three percent of his income. During 2007's first eleven months, VSP paid Barron approximately $28,555 in reimbursements. During the same period, Barron also collected approximately $3,783 in co-payments.

Until 2007, Barron rented space from D.O.C. Optics Corporation [D.O.C.], a Michigan-based retailer of corrective eyewear. D.O.C. never employed Barron.

In early February, 2007, Luxottica U.S. Holdings Corp. [Luxottica], a New York-based designer and manufacturer of corrective eyeware, notified VSP that it would soon purchase D.O.C. and all of its assets. On February 20, Jim Lies, Chief Financial Officer for Luxottica sent Thomas

3

Fessler, VSP's general counsel, an e-mail confirming Luxottica would acquire D.O.C. Luxottica additionally included a list of VSP member optometrists whom D.O.C. employed or were its franchisees or licensees. Luxottica included Barron's name on the list. Lies and Fessler subsequently exchanged e-mails regarding the listed optometrists' contractual status. Lies explained that Ohio optometrists, including Barron, were independent contractors.

On February 24, 2007, Luxottica acquired all of D.O.C.'s assets. As part of the acquisition, Luxottica acquired Barron's lease.

On March 9, 2007, VSP mailed Barron a questionnaire to complete in light of Luxottica's acquisition of D.O.C. On March 15, 2007, Barron mailed the completed questionnaire to VSP.

On April 16, 2007, VSP mailed Barron a letter informing him VSP would terminate his membership. The letter explained that VSP was terminating him "because the conditions which afforded [Barron's] participation in VSP's Doctor Network require that [Barron], among other things, remain employed by D.O.C. , and comply with all other VSP requirements for participation. It is apparent from the information submitted that Barron is no longer employed by D.O.C." [Doc. 2, Ex. 10].

Barron subsequently appealed the termination to the VSP Quality Management Committee [Committee], which held an informal telephone hearing on the matter. Barron testified that the 1994 Letter did not require that D.O.C. continue to employ him, but that the same employer continue to do so. As he was then and still remains self-employed, Barron explained that his employment status had not changed. The Committee upheld Barron's termination explaining that D.O.C. no longer employed him "and/or [he failed] to meet all VSP rules and regulations." [Doc. 2, Ex. 11].

Barron subsequently appealed the Committee's decision. On September 26, 2007, VSP convened a formal hearing on Barron's termination. At the hearing, the VSP appeals and hearing administrator read the charge:

> This hearing concerns your change of employer in breach of VSP network doctor requirements. Your VSP network doctor participation requires among other things, that you remain employed by D.O.C. Optics Corporation, practice at your then approved location and meet all other rules and regulations. Available information indicates that you are no longer employed by D.O.C. Optics Corporation, but are directly or indirectly employed by Pearle Vision, LensCrafters or [another] Luxottica related entity. An employment relationship with a party other than D.O.C. Optics Corporation is a breach of your VSP network participation. Based upon this material violation, VSP elected to terminate its contractual relationship with you by giving not less than 90 days prior written notice.

[Doc. 2, Ex. 13].

Barron again testified that his employment status had not changed. The presiding panel found against him, concluding that his "affiliation with Luxottica, voluntary or otherwise, [was] a material nonconformance and/or breach of the terms of the VSP Network Doctor Agreement." [Doc. 2, Ex. 15].

On November 28, 2007, VSP issued Barron a termination letter. The letter explained that "as a result of the Luxottica acquisition of [D.O.C.], voluntary or otherwise, a non-VSP consented material change in the ownership, operations of and/or management of the practice occurred." [*Id.*]. Barron could continue seeing VSP patients until January 3, 2008, after which VSP would not reimburse subscribers which visited him.

Barron subsequently filed this suit seeking a permanent injunction forbidding VSP from: "1) terminating Dr. Barron's membership as a VSP panel optometrist; 2) excluding Barron from its lists of VSP providers; or 3) altering the manner in which it processes claims for services and goods submitted by or on behalf of Barron." [Doc. 1].

On January 17, 2008, the parties agreed to a standstill agreement. VSP promised "to take no action to terminate plaintiff from any plan or program" or "adverse to plaintiff's professional interests or adverse to plaintiff's rights." [Doc. 15, Ex. 3]. The parties originally set the agreement to expire on January 28, 2008. They have since repeatedly extended the standstill agreement. It currently expires on June 30, 2008.

Barron alleges that in mid-January, 2008, VSP mailed him certification materials and a revised Agreement. VSP also included a letter dated January 23, 2008.

The Agreement included two significant changes. First, the integration clause excluded any mention of VSP's by-laws or other documents as part of the Agreement. Second, the Agreement explained that it "supercede[d] and replace[d] any and all prior written and oral agreements or contracts between Network Doctors and VSP." [Doc. 16].

Andrea Hamel, VSP's Manager of Provider Networks, testified that VSP actually sent these materials sometime in November, 2007, five months before the previous Agreement expired, as per their general practice.

Barron expressed concern over the changes, specifically whether they would waive his lawsuit. VSP did not offer an alternate version of the Agreement, but notified Barron that if he did not complete, sign, and submit the materials by March 23, 2008, VSP would exclude him from its network. Barron did not sign or return the new Agreement or certification materials.

Barron alleges, however, that on April 7, 2008, "[a]fter some clarification from VSP on what type of documentation it was requesting," Barron "provided VSP with his certificate of professional insurance, License Agreement with D.O.C. Optics, and a Sublease Agreement with Luxottica." [Doc. 16]. Barron also alleges that on April 14, 2008, "Barron further sent, at VSP's request, a

6

Business Associate Agreement and Patient Release Form." [*Id*.]. VSP alleges that Barron never submitted proper certification materials.

## Discussion

A preliminary injunction is an extraordinary remedy which a court should only grant if the movant carries its burden of persuasion. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). In deciding whether to issue a preliminary injunction, a district court must consider:

> 1) whether the moving party has a strong likelihood of success on the merits; 2) whether the moving party will suffer irreparable injury without the injunction; 3) whether the issuance of the injunction would cause substantial harm to others; and 4) whether the public interest would be served by issuance of the injunction.

*National Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003)(citing *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000)).

These four considerations are factors the court should balance, not prerequisites that the moving party must meet. *Id.* (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)). A district court need not make findings as to each of the four factors if fewer factors determine the issue. *Id.*

As the Supreme Court has stated, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Given this limited purpose, a preliminary injunction is customarily granted on the basis of procedures less formal and evidence less complete than that in the record of a trial on the merits. A party thus is not required to prove its case in full at a preliminary injunction hearing. *Id.*

### 1. Strong Likelihood of Success on the Merits

To establish a likelihood of success on the merits, a party must show more than a mere possibility of success. It is ordinarily sufficient if the plaintiff raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

Barron alleges that VSP's termination of him constitutes: 1) a breach of the 1994 Letter and the Agreement which incorporates the 1994 Letter; and 2) a violation of the duty of good faith and fair dealing.

While there is a strong likelihood that plaintiff will prevail on his first claim, there is not a strong likelihood that plaintiff will prevail on his second claim.

### A. Breach of the 1994 Letter and the Agreement

To prove a breach of contract claim, a plaintiff must demonstrate by a preponderance of the evidence that: 1) a contract existed; 2) the plaintiff fulfilled his obligations; 3) the defendant failed to fulfill its obligations; and 4) this failure caused damages. *Lawrence v. Lorain Cty. Community College*, 127 Ohio App.3d 546, 548-49 (1998).

The parties dispute whether a contract existed and whether VSP's exclusion of Barron from its network constitutes a breach.

### i. Was the 1994 Letter a Valid Contract?

The elements of a contract include: "an offer, an acceptance, contractual capacity, consideration (the bargained-for legal benefit or detriment), a manifestation of mutual assent, and legality of object and of consideration." *Lake Land Empl. Group of Akron, LLC v. Columber*, 101 Ohio St. 3d 242, 246 (2004).

Ohio regards an employer's promulgation of employment manuals, employee handbooks or other writings, styled "personnel policies and practices," as giving rise to rights enforceable in contract, if the necessary elements reasonably appear from the facts. *Helle v. Landmark*, 15 Ohio App. 3d 1, 6-8 (1984).

The sole dispute is whether the parties assented to the creation of a contract.

VSP argues that because Barron cannot produce a copy of the 1994 Letter he alleges VSP sent him and allegedly is not certain that he received a letter describing the grandfathering agreement, he cannot prove that he manifested an intent that the Agreement's terms bind him. *See City of Ravenna v. Fouts*, 1994 WL 88980, *3 (Ohio App.) ("To prove that a contract existed, they must prove that an agreement existed. In other words, they must prove there was mutual assent or a meeting of the minds as to the offer and acceptance[.]").

VSP's allegations distort Barron's statements. While VSP makes much of Barron's qualification in his complaint – "upon information and belief," VSP sent the 1994 Letter – it ignores that in his first sworn affidavit, Barron states without qualification that he received the 1994 Letter. That Barron qualified his first allegation and unequivocally stated the second is reasonable. As Barron did not mail the 1994 Letter, he cannot be sure that VSP sent it. As the recipient, however, he can be certain that he received the 1994 Letter.

Nor is it fatal to Barron's claim that he does not present the specific letter that he alleges VSP mailed him. Barron presents an identical letter from Michael Stein, another member optometrist, containing the guarantee Barron alleges he relied on. Accordingly, the weight of the evidence suggests that Barron did receive the 1994 Letter and assented to its terms.[1]

---

[1] I note that there is no indication in the record that VSP sent the 1994 letter to only certain, but not

9

Second, VSP argues that it never assented to the 1994 Letter. It notes that the 1994 Letter does not include the word contract or other similar terms, but instead describes the plan as a "special accommodation," a phrase which it alleges is precatory and synonymous with non-binding actions.

Whether an employer's policy constitutes a binding obligation depends on whether the document's grant is mandatory, specific, and/or formal. *See Sagonowsky v. Andersons, Inc.*, 2005 WL 217023, * 13 (Ohio App.) (finding that employer disciplinary policy was not binding where the policy was not mandatory, specific and formal).

The letter specifically provides that a grandfathered optometrist will remain part of the VSP network if he does not change employers, address or violate other VSP policies or by-laws. Save for assessing whether a network optometrist has violated this sole condition, the letter does not give VSP discretion to consider other unspecified circumstances. *See Gangasz v. Nordson Corp.*, 68 Ohio App. 3d 149, 153-54 (1991) (finding that a manual was non-binding where the employer could consider the "nature and circumstances" of the infraction before imposing a penalty).

Nor does the Agreement leave any discretion to VSP as to the benefit it will provide. *See Aeroquip Corp. v. Miller*, 1995 WL 739601, *2 (Ohio App.) (finding no binding contract where the alleged contract included merely vague promises about job security).

Finally, the letter does not reserve for VSP the right subsequently to amend or limit the program without cause or explanation. *See Duncan v. Bellemar Parts Industries Inc.,* 1991 WL 216782, *2-3 (Ohio App.) (finding program non-binding where employer on its own initiative could bypass some of the disciplinary hearing's steps).

---

all persons within the category of apparently intended recipients. Absent such indication, a presumption arises that Barron, as a member of that category, received the letter along with everyone else.

Rather, the 1994 Letter is phrased in terms of a clear exchange – if the doctor satisfies X, VSP will provide Y. The lack of any discretion beyond the sole concrete condition suggests that the parties intended the 1994 Letter to create a binding agreement.

### ii. Did VSP Breach the 1994 Letter?

VSP argues that even if the 1994 Letter is a valid contract, VSP's exclusion of Barron from its network did not constitute a breach because: 1) the integration clause in the Agreement precluded the 1994 Letter's consideration; 2) the Agreement's termination clause allowing VSP to terminate Barron immediately with cause or within ninety days without cause superceded the 1994 Letter; 3) Barron's change of landlords constituted an unapproved material change and, therefore, justified VSP's exclusion of him from the network; and 4) the Agreement governing Barron's inclusion in the network expired.[2]

### a. The Integration Clause

VSP alternatively argues that even if the 1994 Letter is a contract, the integration clause in the Agreement precludes its applicability. VSP's argument overlooks that the integration clause includes "all amendments thereto," excluding only oral waivers. The 1994 Letter was in writing and the Board recorded its terms in writing in its minutes. Accordingly, the integration clause favors inclusion of the 1994 Letter as a written amendment to the Agreement, rather than its exclusion.

### b. The Termination Clauses

---

[2] VSP, in its opposition brief, does not, in contrast with its arguments during the informal and formal hearings, argue that Barron changed employers. Even if they did, neither party has presented any evidence that Barron has not been an independent contractor for the duration of his relationship with VSP.

11

VSP also argues that the Agreement's provisions allowing it to terminate Barron within ninety days with written notice or immediately if there is cause superceded and, thereby, circumscribed the 1994 Letter's grant. As VSP notes, the terms of a later contract will generally supercede contradictory terms in a previous contract. *See Osborne v. Scott*, 1985 Ohio App. LEXIS 9260, *4 ("Such provision, having been accepted without objection, and being later in time than an inconsistent provision in the options, must be presumed to be the controlling agreement of the parties[.]").

This argument would be more meritorious, if, as discussed above, the Agreement did not incorporate the 1994 Letter. As discussed above, the integration clause specifically incorporates all amendments and addenda thereto. Accordingly, the Agreement, by referencing rather than excluding the 1994 Letter, incorporates it and creates an inherent conflict between its own terms.[3]

If the court cannot determine the parties' intent from a contract's four corners, a factual determination of intent or reasonableness is necessary. *Davis v. Loopco Industries, Inc.*, 66 Ohio St. 3d 64, 66 (1993). The factfinder must interpret a contract which has contradictory provisions. *See id.* at 66 ("From the four corners of the purchase agreement, we cannot determine which party is responsible for product-liability claims occurring after the effective date of the asset purchase agreement . . . . This presents a question of fact for the factfinder.").

---

[3]

I note that my reading of the clauses is consistent with that of Judge Nancy Edmunds in *Brighton Optical, Inc. v. Vision Serv. Plan*, 422 F. Supp. 2d 792, 804-05 (E.D. Mich. 2006). In *Hagan v. Vision Serv. Plan*, 2005 WL 3447882 (E.D. Mich), Judge Edmunds also analyzed the 1994 Letter and the Agreement. She did not, however, address the effect of the termination clauses.

Regardless, VSP's failure to mention two cases in which the same firm litigated the same factual and legal issues, while reusing many of the same arguments which the court there rejected is, at best, careless and, at worst, inappropriate and potentially sanctionable, particular if done purposefully to conceal those pertinent decisions from me.

While VSP asserts here that it did not intend the Agreement to be perpetual and, therefore, supercede the termination clauses, in *Hagan*, *supra,* 2005 WL 3447882, *3, involving the same 1994 Letter and Agreement, VSP admitted that "each of the grandfathered agreements was and is perpetual, and was intended to apply to each successive [Agreement] and each successive credentialing. VSP intended that its grant of grandfather status to those doctors would extend as long as the doctors remained with their current employer and met all other VSP membership rules." Considering that VSP has elsewhere admitted that it intended the 1994 Letter to be perpetual and to extend to all subsequent iterations of the Agreement, and, moreover, that Barron likewise viewed the 1994 Letter's grant as perpetual, I find that there is a strong likelihood that the 1994 Letter, not the termination clause, is controlling.

### c. Material Change

VSP also asserts that it was justified in terminating its relationship with Barron as his change in landlords constituted a material change violating the Agreement's prohibition on material changes without VSP's prior approval.

VSP specifically argues that Barron will now practice inside a LensCrafters' Store as opposed to a D.O.C store. This allegedly will imply to consumers a connection between him and Luxottica. LensCrafters' employees filling Barron's patients' prescriptions allegedly also will have access to his records, further blurring the line between him and Luxottica.

Assuming these allegations to be true, VSP fails to explain how this situation significantly differs from that which existed while Barron rented space from D.O.C. Barron has not changed his practice. He remains self-employed. He has not changed his office hours, office location, appointment process, eye exam procedures, or practices regarding patient records.

13

The sole difference is from whom Barron rents space. While consumers may associate Barron with LensCrafters, they previously associated him with D.O.C, despite the fact that he was and is an independent contractor. Likewise, while LensCrafters' staff may have access to his records, D.O.C.'s staff presumably had similar access while he rented space from it. Beyond vague allegations about Luxottica's status as a large corporation, VSP does not explain why the potential that others might associate Barron with LensCrafters, as opposed to D.O.C., constitutes a material change.

Assuming, furthermore, that the change in landlords constitutes a material change, VSP has given no reason why it would terminate its relationship with Barron on that basis. While Ohio does not recognize a separate tort for violations of the implied duty of good faith and fair dealing in contracts, it recognizes that all contracts include a good faith and fair dealing requirement. *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 462 (2005). Accordingly, Ohio law requires that before VSP terminate its relationship with Barron on the basis of a material change on his part, VSP provide a legitimate basis for doing so.

### d. Expiration of the Agreement

Finally, VSP argues that it can no longer include Barron in its network because he failed to sign an Agreement and submit certification materials before the previous materials expired. VSP's argument overlooks three key facts.

First, and most importantly, the standstill agreement to which VSP agreed, provides that it shall "take no action to terminate plaintiff from any plan or program or take no action adverse to plaintiff's professional interests or adverse to plaintiff's rights." VSP argues that by letting the previous Agreement expire on March 23, 2008, Barron, rather than VSP, excluded himself from its

14

network. This argument overlooks the fact that the proposed renewal Agreement VSP sent Barron changed his rights. That Agreement provided that it would supercede all written materials, rather than incorporate them. The net effect of such would be to terminate the basis for Barron's suit and violate the standstill agreement.

Nor am I convinced that VSP actually sent the agreement in November, 2007 – two months before the parties agreed to the standstill agreement. The letter included with the Agreement is dated January 23, 2008. This supports Barron's assertions that he did not receive the Agreement until after he had filed suit and the parties had agreed to comply with the standstill agreement. VSP, in response, presents only Hamel's vague and unsubstantiated testimony about sending the letter in November, 2007. Neither she nor VSP present any documentary evidence or details as to when, beyond the month of November, VSP sent the draft renewal Agreement. Accordingly, by not demanding that Barron renew the Agreement until after he had filed suit, VSP waived any rights it may have had.

Third, VSP exaggerates its concerns about having a doctor in its network who does not meet its certification requirements. On April 7 and April 14, 2008, after VSP clarified the documents that it sought, Barron submitted the required certification materials.

### B. Duty of Good Faith and Fair Dealing

VSP correctly asserts, however, that it is not substantially likely that Barron will prevail on his claim for breach of the implied duty of good faith and fair dealing. As I noted, Ohio does not recognize a separate tort for the breach of good faith and fair dealing in contracts. *Littlejohn*, *supra,* 163 Ohio App. at 462.

### 2. Irreparable Harm to the Movant

If I do not grant the preliminary injunction, Barron will suffer irreparable harm.

Income from patients VSP refers to Barron constitutes the single largest source of Barron's income. VSP member's co-payments are also a significant source of Barron's income. During the first eleven months of 2007, Barron collected approximately $3,783 in co-payments. Together, VSP reimbursements and co-payments constitute almost twenty-five percent of Barron's annual income.

As VSP asserts, some patients may continue to see Barron if their VSP coverage includes "out of network" benefits or if they are willing to pay the difference. Out of network benefits, however, are less than "in network" benefits. It is unlikely that many patients would see a non-network optometrist when they could see a network optometrist for significantly less. Not surprisingly, according to VSP, over ninety percent of its patients see network optometrists.

If Barron, furthermore, were to prevail on his claim against VSP, it is unlikely that many of his former patients would return to him once he rejoined the network. In the meantime, most patients would have found other providers. Many, if not most, of these patients would probably not go through the additional effort of switching optometrists for the second time in a short period. Even those who did consider returning might not as a result of the lawsuit's impact on Barron's reputation.

VSP, in response, provides only conclusory and unsubstantiated allegations. VSP first argues that Barron's present affiliation with Luxottica would enable him to make up any loss he might incur if the injunction did not issue. Assuming that VSP's allegations about Luxottica and its alleged network are true, VSP has not presented any evidence that Barron is a member of it. Likewise, VSP has presented no evidence that Luxottica will advertise on Barron's behalf or refer patients to him. Nor has VSP explained how affiliation with Luxottica will be of greater benefit to Barron financially

than his past affiliation with D.O.C. Most simply put, there is no evidence that Luxottica is anything more than a landlord to him.

VSP also asserts that any specials which LensCrafters' makes available will likely make up any monetary differences for out of network subscribers who continue seeing Barron. VSP provides no evidence that these specials exist, what they are or why they have had no effect on the ninety percent of VSP subscribers who see in the network optometrists. Again, these arguments overlook that Luxottica merely leases space to Barron.

Barron has shown that refusal to grant him injunctive relief will cause significant harm that he likely cannot recoup. VSP's conclusory speculation about how Barron might come out financially o.k. in the long run does not undercut Barron's showing of harm and its irreparability.

### 3. Harm to Others as a Result of Issuance

VSP's arguments regarding harm to it and the public are similarly conclusory and unpersuasive.

VSP first argues that an uncertified optometrist such as Barron would harm its members and the public. As discussed above, Barron has provided VSP with the certification materials it requested.

VSP also argues that an optometrist who is an independent contractor as opposed to one who is beholden to the interests of a large international conglomerate such as Luxottica best serves its member patients' needs. VSP ignores the fact that Barron is and remains an independent contractor. VSP provides no explanation as to how it is beholden to Luxottica's interests. It is far more likely that Barron is and will remain beholden to the welfare of his VSP-referred patients, and do his best to keep them well-served and content with his services.

Accordingly, I find that little, if any harm will occur to others if Barron remains a member of the VSP network.

### 4. Public Interest

Finally, allowing Barron to remain a member of the VSP network will serve the public's best interests, specifically those of the nearly 1,000 patients Barron serves and has served. Allowing Barron to continue to practice will allow his patients to receive uninterrupted eye care. Terminating Barron's relationship with VSP would require most of, if not nearly all, these persons to find new optometrists – a task the elderly or disabled may find particularly difficult.

### Conclusion

Accordingly, considering that there is a strong likelihood that Barron will succeed on his breach of contract claim, the balance of harms favor Barron and the public interest favors the inclusion of Barron in VSP's network, I shall grant Barron's motion for a preliminary injunction.

For the foregoing reasons, it is hereby

ORDERED THAT plaintiff Mark Barron's motion for a preliminary injunction [Doc. 2] shall be, and the same hereby is granted.

So ordered.

s/James G. Carr  
James G. Carr  
Chief Judge